**Opinion filed January 26, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00013-CR

_____

## FRED ORA RIDINGS, III, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 167th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-DC-09-904115**

### MEMORANDUM OPINION

The jury convicted Fred Ora Ridings, III of the offense of murder, and the trial court assessed punishment at confinement for thirty-two years. Appellant presents three points of error: (1) the trial court erred in finding there were sufficient facts to find appellant competent to stand trial; (2) the evidence was factually insufficient to support the jury's finding of guilt; and (3) the trial court erred in failing to give an accomplice-witness instruction. We affirm.

### Background Facts

On August 6, 2008, Austin Police Officer Thomas Castonguay heard five nearby gunshots during his evening patrol shift. Calling to report the gunshots, he heard two additional shots. Other people also began calling the Austin Police Department. Officer Christi Bergh

responded to a call from the dispatcher who directed her to go to 1103B North Meadows in Austin, an address that was only about 150 yards from where Officer Castonguay heard the shots. There she found people trying to give first aid to a wounded man lying on the ground. The victim, Ronnie Whited, died from his wounds and was identified by his twin brother, Donnie Whited, who was at the scene.

Robert Woolsey lived at 1103B North Meadows and was there that day. He testified that Wendy Fosdick, his sister Laura, and the twins were at the duplex. Wendy, Laura, and Donnie lived there at the time. Laura and Donnie were outside "cooking methamphetamines." Woolsey and Wendy were inside watching television. Around 8:30 or 9:00 p.m., Howard Beard appeared in Woolsey's backyard. A week earlier, Beard had been at Woolsey's duplex and overdosed on heroin. Beard believed that his guitar had been stolen from his pickup at that time. Appellant had driven Beard in his white minivan to Woolsey's duplex because Beard was trying to locate his guitar. In addition, appellant had a dispute with the twins over drugs that the twins had not delivered to him.

Woolsey said that he went over to speak with appellant, who was in the driver's seat of the white minivan. Woolsey asked appellant if there was a problem, and appellant replied that "he just wanted what he was owed." Not knowing what appellant was talking about, Woolsey asked Donnie if he owed appellant anything. Donnie said that he did not, and Woolsey walked back into his apartment. Before going inside, Woolsey saw Donnie throw rocks at the minivan. Woolsey was almost to his bedroom when he heard gunshots, but he did not know who fired the weapon.

At about 11:30 or 12:00 that night, Woolsey was cooking dinner with Wendy when he heard two gunshots. As he went toward the front door, he heard three or four more gunshots. Again, he did not see who did the shooting. As he ran outside, his sister yelled that someone had shot Ronnie.

Appellant's defense was that it was Beard who did the shooting. When asked by the State to describe how appellant and Beard were dressed earlier that day, Woolsey said that appellant was wearing a hat but that Beard was not wearing a hat. Beard was wearing jeans and a shirt. Woolsey also testified that Beard had not made any threats to anyone that day but that he was unhappy about losing his guitar.

2

Marco Ornelas, a fourteen-year-old boy who lived nearby, testified that around midnight he had gone out to get his soccer ball when a white minivan pulled over. A white man got out from the driver's side with something like a shotgun, "racked" it, and shot once into the air. The man was wearing a black baseball cap and black shorts. Marco became scared and ran into his house. He then heard three or four more shots. Marco thought that the man with the gun at midnight was the same man who came in the minivan earlier that evening and was arguing with the people at the duplex; however, he could not be certain because it was dark. He described the man as being average height, "between five nine and six feet."

Beard testified that the victim had been a good friend of his but that he did not know Donnie as well as he did Ronnie. Beard admitted that he had abused drugs since he was fourteen and that he was now fifty-four years old. When asked to identify appellant during his testimony, Beard said he could not because he did not have his glasses.

Beard testified that he had ridden with appellant earlier in the day around three or four in the afternoon. Appellant was taking Laura (Donnie's girlfriend and Woolsey's sister) from pharmacy to pharmacy to get Sudafed and other materials to make speed; Beard was riding with them because he had obtained some drugs from appellant. Beard said that appellant told him that he had "invested in some stuff with [Laura]." Beard told appellant that he would not "invest" anything with "kids nowadays" because "it is hard to get anything out of the kids." Apparently, appellant had given money to Laura for drugs that had not been delivered. They dropped Laura off at the Woolsey duplex and left.

Beard said that he and appellant returned to the Woolsey duplex a second time to check on his guitar. Again, appellant had driven Beard there in the white minivan. Beard claimed that there was an argument between appellant and the twins over drugs that the twins had not delivered. According to Beard, appellant argued with the twins and then got back into the minivan. Someone then threw rocks at the minivan. Appellant pulled out a .38 revolver and shot two rounds into the yard. Beard said that he pulled the revolver out of appellant's hand because "[i]t was dangerous, dangerous to the neighborhood, you know, don't shoot rounds off in the neighborhood." After taking the gun, Beard told appellant that they needed to get out of there.

Appellant and Beard then took a friend, Melissa Correll, to Round Rock. On the way back, appellant said that he was going back to the duplex to check on his drugs. Beard said that he told appellant that he did not want to go there because appellant had fired the shots earlier.

3

Beard claimed that he got out at a Wendy's restaurant but did not go in because he was not wearing a shirt. Appellant returned to pick Beard up in about fifteen to thirty minutes. Their next stop was at a service station where they picked up Efrain Amaro. Amaro had run out of gas and had a gas can in his hand; he needed a ride back to his car.

Almost immediately after leaving the service station, the police pulled the minivan over. Beard testified that, "[b]efore the police had pulled us over, they were behind us, 15 strong behind us,[1] I said what did you do. [Appellant] said I shot him. I went what? I didn't ask anymore. I was just freaked out."

Amaro testified that he had run out of gas and that someone had given him a ride to the service station. Although he did not know Beard very well, he recognized Beard and asked for a ride back to his car. The police stopped them almost immediately, and Beard appeared very surprised at the stop. In appellant's brief, he states that Amaro did not testify that appellant told Beard that he had shot someone. However, the record reflects that neither party asked Amaro if he heard a statement to that effect.

Wendy Fosdick testified that she was staying with Woolsey in August 2008. She admitted that she previously had a drug problem, but claimed she no longer had one. Wendy said that she slept that day until about 4 p.m., when appellant came by with Beard and Correll. Appellant was driving a white minivan. At around 8:30 p.m., she spoke with appellant, who told her that being at Woolsey's duplex "wasn't going to be a very good place to be that evening." She thought he meant that he was going to call the police about the drugs there. She told Woolsey and Donnie about appellant's remark.

Wendy said that Beard was not wearing a hat because "[he] is not much for hats." She recalled hearing gunshots early that evening and thought that the shots came from the minivan; however, she could only see the van's top over the wall. Around midnight, she heard a strange noise and thought the police might be there. As she ran out the front door and looked to the right, she saw a muzzle flash and heard the victim scream. Then there were about four more gunshots. She saw that a man had fired the shots; however, it was too dark to identify him.

An AK-47 rifle, a .38 revolver, and ammunition for both were found in the minivan. The officers also found shell casings for a .38 caliber revolver in appellant's pocket. Police Officer

---

[1]Officer Matthew Jones was one of the officers involved in stopping the minivan. Officer Jones testified that ultimately there were about fifteen officers and more than ten police cars involved because the stop was termed a high-risk felony stop.

Matthew Jones said that appellant's first words after the stop were "don't let them steal my guns." Asked what guns, appellant replied, "My .38 Special with diamonds on it and my AK-47." Virginia Ridings, appellant's mother and a defense witness, later confirmed that appellant had brought the AK-47 rifle into their home. She also testified that she and her son were hunters and that her son was proficient with a rifle.

Gunshot primer residue analysis was done on all three men in the minivan, and all three had indications of primer residue on their hands. There was expert testimony that the 7.62 caliber bullet removed from the victim was fired from the AK-47 rifle belonging to appellant. The expert test-fired the rifle and concluded that the cartridges fired as a test and the five Winchester 7.62 by 39 fired cartridge cases found at the crime scene were all fired from appellant's rifle.

A senior forensic scientist at the Austin Police Department DNA Unit testified concerning the DNA profiles found on the rifle and the .38 caliber revolver. She testified that appellant could not be excluded as the contributor of the major component in the DNA profile at thirteen locations on the rifle, i.e., his DNA was the major component on the rifle. Beard and Amaro could be excluded. The DNA profile from the swab of the strap of the rifle was also analyzed. Neither appellant nor the victim could be excluded as contributors to the DNA profile on the rifle strap that came from at least three individuals; however, Beard and Amaro could be excluded. Thus, appellant and the victim were the contributors to the DNA stain on the rifle strap. Appellant also was found to be the contributor to the DNA profile on the magazine of the rifle. The expert concluded by saying that Beard's DNA was not found on any of the items she analyzed.

*Sufficiency of the Evidence*

In appellant's second point of error, he argues that the evidence was factually insufficient to support the jury's finding of guilt. It is now settled that we review the sufficiency of the evidence under the currently applicable legal sufficiency standard of review. *See Wirth v. State*, 327 S.W.3d 164, 165 (Tex. Crim. App. 2010) (confirming that *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), was overruled by *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). Whether it is denominated as a legal or factual challenge, we review the challenge under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The standard of review for an appellate court in evaluating the legal sufficiency of the evidence is to determine whether any rational finder of fact could have found the existence of the elements of the offense beyond a reasonable doubt after viewing all of the evidence in a light most favorable to the verdict. *Jackson*, 443 U.S. at 319. The appellate court's duty is not to sit as a thirteenth juror reweighing the evidence or deciding whether it believes the evidence established the elements in question beyond a reasonable doubt. *Blankenship v. State*, 780 S.W.2d 198, 206–07 (Tex. Crim. App. 1988).

Under the above standard, all evidence, including circumstantial evidence, is considered. *Nguyen v. State*, 54 S.W.3d 49, 52 (Tex. App.—Texarkana 2001, pet. ref'd). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The legal sufficiency test must be applied to the application paragraph in a hypothetically correct jury charge. *Fuller v. State*, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

There were conflicts in the testimony of some of the witnesses; however, the jury resolved those conflicts. Although Beard may have been upset about the loss of his guitar, there was no evidence that Beard thought the victim had anything to do with that loss. Apparently Beard did tell the police he was upset at Donnie over his guitar. The record reflected that the minivan, which appellant's mother testified was hers, was driven at all times by appellant; that appellant believed the twins had cheated him; that appellant's and the victim's DNA was on the rifle; that appellant's DNA was on the rifle's magazine but Beard's was not on the rifle or the revolver; that appellant was proficient with a rifle; and that appellant was the owner of the rifle and the .38 Special revolver. Both appellant and Beard had gunshot residue on their hands; however, Beard's may have come from the pistol when he took it away from appellant.

The evidence was sufficient for any rational finder of fact to find appellant guilty of murder. Appellant's second point of error is overruled.

*Appellant's Competency to Stand Trial*

In appellant's first point of error, he contends that the trial court erred in finding that there was sufficient evidence that appellant was competent to stand trial. One of the experts, a clinical psychologist who testified at the final competency hearing, had been retained to examine appellant for an insanity defense. Therefore, it is helpful to review the difference between the

test for insanity at the time of the offense and the test for being competent to stand trial. It should be kept in mind that the defendant has the burden of proof on both affirmative defenses. Before a retrial may be had, there must be a determination by this court that the trial court's rejection of a plea of insanity or incompetency is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990). Because appellant had been restored to competency, he had the burden to prove by a preponderance of the evidence that he was incompetent to stand trial. *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987); *Galvan v. State*, 324 S.W.3d 233, 235 (Tex. App.— Eastland 2010, pet. ref'd).

The test for the insanity defense is found in Section 8.01 of the Texas Penal Code:

(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

(b) The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

TEX. PENAL CODE ANN. § 8.01 (West 2011).

As opposed to a focus on the conduct at the time of the offense, the test for whether a defendant is competent to stand trial has as its focus the time of trial. The competency test is found in Article 46B.003 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 46B.003 (West 2006). That article also provides that the defendant is presumed competent to stand trial unless proved incompetent by a preponderance of the evidence. The test is that a person is incompetent to stand trial if the person does not have either (a) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding *or* (b) a rational as well as a factual understanding of the proceedings against the person. Article 46B.003; *Morris v. State*, 301 S.W.3d 281, 285–86 (Tex. Crim. App. 2009).

Two days after the murder, attorney Nick Duncan was appointed to represent appellant. After interviewing appellant, Duncan requested that appellant be examined for a competency determination. Dr. Richard E. Coons, a psychiatrist who practices general and forensic psychiatry, performed the initial evaluation. Dr. Coons has done 8,000 to 10,000 evaluations for competency to stand trial. Dr. Coons met with appellant on August 16, 2008, and found appellant incompetent at that time because appellant had auditory hallucinations. Appellant could not tell whether it was other people making noise in the jail where he was or whether they

were hallucinations. That was ten days after the offense. An agreed order of incompetency and commitment was entered on September 8, 2008.

Appellant was transferred to the North Texas State Hospital for evaluation and treatment; he was there for four months. In January 2009, Dr. Coons saw him again after Duncan requested another competency evaluation. This second time, Dr. Coons found appellant competent to stand trial based on the assessment by the North Texas State Hospital and on his own assessment. On May 21, 2009, the trial court entered an order restoring appellant's competency to stand trial. Dr. Coons interviewed appellant again on June 13, 2009, and again concluded that appellant was competent to stand trial.

In April 2009, Duncan had also filed a notice of intent to offer an insanity defense, and he had engaged Dr. Dusty Humes for an evaluation to support that defense. Dr. Humes examined appellant on April 12 and 22 and May 13. Kent Anschutz was appointed counsel to replace Duncan in September 2009. In October 2009, Anschutz requested that appellant be examined again by a psychiatrist for competency to stand trial. A competency hearing was held by a local magistrate in Travis County on November 2, 2009. Both appellant and the State waived a jury. The magistrate determined that appellant was competent to stand trial and entered findings of fact. The trial court adopted the findings and entered an order that appellant was competent to stand trial.

At the hearing, Dr. Dusty Humes, a clinical psychologist, testified that she had performed at least two hundred competency evaluations and that she had been retained to examine appellant for an insanity defense. Dr. Humes first gave appellant a common test of personality where appellant scored somewhat high on the scale measuring paranoia, but Dr. Humes was not convinced that there was any kind of psychotic process. Dr. Humes stated that appellant looked fine on other scales.

On April 22, 2009, appellant told Dr. Humes about his delusional system. Dr. Humes described appellant's particular delusion as follows:

> It's based on the idea that there has been one man whose name changes over time, but is often referred to as Charles or Charlie, who [appellant] believes since he was very young before grade school has been sort of directing [appellant's] life. And that this person has taken -- has come into [appellant's] life in the form of different people that look different, but they are always the same person underneath. They are this man. And that this person has -- he doesn't use these

8

words. But I [Dr. Humes] would say sort of super human powers, in that; he organizes and sort of runs the world in many ways.

Dr. Humes then expressed an opinion that this delusional belief impacted appellant's ability to understand his legal situation because Dr. Humes thought appellant believed that Charlie would not let him go to jail or remain in jail. Dr. Humes "had strong doubts that [appellant could] work with [his attorney] to look at the different choices and defense strategies." On cross-examination, Dr. Humes acknowledged that she had not discussed with appellant his understanding of the proceedings. That was consistent with Dr. Humes being retained to examine appellant to determine if he knew at the time that the victim was killed that a murder of the victim was wrong.

Duncan, appellant's former counsel, testified that he had believed appellant's competency to stand trial would be an issue because of appellant's delusions. Duncan testified that he was surprised that the North Texas State Hospital found appellant to be "totally competent" with "no mental problems." After appellant returned from the state hospital, Duncan had again raised the issue of competence with the trial court, who had appellant brought before the court. Duncan testified that, in response to a question by the trial court, appellant then proceeded to "clearly and succinctly describe in detail the correct role of the Judge[,] . . . the correct role of the defense attorney, and the correct role of the prosecutors." Duncan said that appellant's performance was truly "amazing" and "impressive."

Duncan further testified that he did not believe appellant had a rational understanding of the proceedings; it did not seem rational to him that appellant would "totally ignore proposals about what [Duncan] considered to be fairly reasonable offers" because appellant thought that Charlie would take care of him. But a defendant's refusal to follow counsel's advice in making decisions does not mean the defendant is incompetent to stand trial. *See Arnold v. State*, 873 S.W.2d 27, 35-37 (Tex. Crim. App. 1993) (defendant rejected lawyers' advice and refused to permit lawyers to cross-examine several witnesses).

In his testimony, Dr. Coons reviewed his assessments of appellant's competency to stand trial. In January 2009, after appellant had returned from the state hospital, Dr. Coons had found him to be competent, and in June 2009, he again found appellant competent to stand trial. The day before the competency hearing, Dr. Coons again evaluated appellant and testified at the hearing as to the basis for his finding that appellant was competent to stand trial.

Dr. Coons testified that appellant had considered his options. Appellant had expressed his opinion that he thought he had a chance of being acquitted because there would be "less than optimal witnesses against him." We note that that was a true statement about Beard and others; they each had a history of drug abuse. Appellant also expressed to Dr. Coons that, if he lost, he hoped that he would have grounds for an appeal. Appellant expressly stated to Dr. Coons that he recognized that he could be put in prison for up to sixty-five years if he were found guilty.

Appellant and Dr. Coons discussed the possibility of an insanity defense. Appellant had spent four months in the state hospital and had a firm desire not to go back. Appellant rejected the idea of an insanity defense. Dr. Coons expressed appellant's decision as follows:

> [Appellant] indicated that he would rather go to trial on the merits of the case, because he didn't want to spend, as he put it, the rest of his life in mental health hospitals. And that if he were in a hospital – if he were found not guilty by reason of insanity being sent to a hospital, then they would have to determine that he was non-dangerous before he would ever be sent to a less secure hospital. And that he would be under the control of the court forever basically for his lifetime.

Appellant stated to Dr. Coons that "maybe Howard [Beard] did it." Dr. Coons concluded that appellant had "a rational as well as a factual understanding of the proceedings against him." Dr. Coons also expressed his opinion that appellant was very good at discussing the Texas court system.

Dr. Coons acknowledged the possibility that appellant was delusional, but he pointed out that appellant was also able to look at his options and choose rationally among them. Dr. Coons stated that appellant "can tell his lawyer for example, that isn't the way that happened, or so-and-so is lying, or he's a dope fiend, or whatever at trial." Even if appellant had delusions about some things in the world, Dr. Coons did not think those delusions would prevent appellant from cooperating with his lawyer.

Dr. Coons testified that he and appellant had discussed appellant's case the night before the hearing:

> [Appellant] and I talked about the way his case would be defended. He talked about the choices that he had and why he made certain choices and why he wouldn't make other choices. And how could he come out of this best and that he could go to the pen if it all fell apart.

Dr. Coons pointed out that often people have delusions and yet they are competent to stand trial. He mentioned those people who believe that Texas does not belong to the Union.

10

That is delusional and yet they are competent to stand trial. Dr. Coons testified that appellant's discussion of his options made sense and that appellant was a bright fellow. Any delusion would not prevent him from cooperating with his lawyer.

One test in Article 46B.003 is whether appellant, at the time of trial, had a rational as well as a factual understanding of the proceedings against him, a somewhat narrow test. Appellant's former counsel testified that he was impressed by appellant's understanding and explanation to the trial court of the roles of the defense attorney, the judge, and the prosecutors. Duncan's belief that appellant did not have a rational understanding of the proceedings was based on appellant ignoring proposals of offers of settlement that Duncan thought were reasonable. Yet, Dr. Coons testified that appellant was aware of his legal options: appellant believed he might win the case because of less than optimal witnesses; if he lost, there might be grounds for an appeal; and he preferred going to trial over the possibility of spending years in a mental health hospital. Dr. Coons explicitly testified that appellant had a rational as well as a factual understanding of the proceedings against him. Dr. Humes acknowledged that she had not discussed with appellant his understanding of the proceedings.

The other test for competency is whether a defendant has sufficient present ability at the time of trial to consult with his lawyer with a reasonable degree of rational understanding. Dr. Coons also supplied expert testimony that appellant met this test. The night before the hearing, Dr. Coons and appellant discussed appellant's case, and appellant talked about the way the case would be tried. Appellant talked about the choices he had, why he had made certain choices, and why he would not make other choices. Although Dr. Coons was aware of appellant's purported delusional belief in Charlie, Dr. Coons expressed his opinion that appellant had the ability to consult with his attorney. The state hospital also found appellant to be totally competent with no mental problems. Dr. Humes did not test appellant in terms of this test. She evaluated him for insanity. But she "had strong doubts that [appellant could] work with [his attorney]" because of his belief that Charlie would take care of him.

The finding of the trial court that appellant was competent to stand trial cannot be said to have been against the great weight and preponderance of the evidence. Appellant's first point of error is overruled.

11

*Accomplice-Witness Instruction*

In appellant's third point of error, he contends (1) that the trial court erred in failing to instruct the jury that Beard was either an accomplice as a matter of law or as a matter of fact and (2) that such failure was harmful to appellant. First, we must determine whether there was error in the charge. Second, if there was error, we must decide whether sufficient harm resulted from the error to warrant a reversal. *See Posey v. State*, 966 S.W.2d 57, 60 (Tex. Crim. App. 1998).

At trial, appellant requested the instructions for both Beard and Amaro. In rejecting appellant's requested charge, the trial court stated that there had been no evidence during the trial that indicated Beard or Amaro was an accomplice in law or in fact. The court expressed its belief that there was insufficient evidence to indict either of them for the offense and no evidence showing that they acted to aid or assist in the commission of the offense by appellant. Based on a reading of the entire record, we agree with the trial court's decision.

A person is an accomplice if he participates with a defendant in the commission of a crime by doing some affirmative act, with the requisite culpable mental state, that promotes the commission of that offense. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006); *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). There must be evidence that is sufficient to connect the alleged accomplice to the criminal offense as a "blameworthy participant." *Cocke*, 201 S.W.3d at 748; *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998). If the witness cannot be prosecuted for the offense with which the defendant is charged, or a lesser included offense of that charge, the witness is not an accomplice witness as a matter of law. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *Paredes*, 129 S.W.3d at 536.

Our reading of the record does not agree with that of appellant. Beard was with appellant before and after the shooting; however, there is nothing in the record that Beard did some affirmative act, with the requisite culpable intent, to promote the commission of the murder offense by appellant. Beard admitted that he had said, "I would die and kill for my guitar," but added, "I didn't mean it." Wendy agreed that Beard said things he did not mean: "[Beard] was ranting and raving about his guitar, but [he] is always babbling." Wendy testified that Beard did not threaten anyone. Woolsey also testified that Beard did not make any threats.

Beard stated that the revolver was "sitting there" in the minivan when appellant was out of the minivan during the earlier visit. And Beard acknowledged that he may have shown the

12

revolver to Wendy; apparently the revolver was unique. Appellant stated to Officer Jones that appellant's revolver had diamonds on it when appellant told him, "[D]on't let them steal my guns." Beard was with appellant when appellant subsequently fired his revolver, but there was no testimony or evidence that the shots were fired at the Whited twins. Appellant fired two shots from the .38 revolver "in the yard," and then Beard took the revolver away from appellant because "[i]t was dangerous."

Appellant points out that Beard had gun primer on his hands, but that may have been from his taking the revolver from appellant. Appellant points out that the only evidence that Beard was not with appellant at the time of the murder came from Beard's testimony. But there was no evidence that Beard was with appellant when appellant shot the victim. Beard testified that he got out at a Wendy's restaurant because of appellant shooting the pistol earlier. Contrary to appellant's statement, there was no evidence that Beard "knew something was going to happen at the house." From the record, it appears that Beard was simply worried that something might happen if appellant and the twins argued again.

Beard testified that, when the police were stopping the minivan, appellant admitted to Beard that he had shot the victim. Appellant argues that the admission was not corroborated by Amaro. But, as we noted, neither the prosecution nor appellant's counsel asked Amaro if he heard the admission by appellant. Appellant is incorrect when he states that the only evidence tying appellant to the murder was the statement by Beard. That statement ignores the DNA evidence connecting appellant with the rifle and indicating that the victim grabbed the rifle's strap, the testimony of Marco Ornelas that the shooter was wearing a black baseball cap and black shorts, the confirming testimony of Lieutenant Christian Malanka that appellant was wearing a dark ball cap and shorts when apprehended, the testimony of Wendy and Woolsey that Beard did not wear a hat but appellant did (Wendy said it was a dark hat), appellant's statements to Officer Jones that the rifle and revolver were his, and other evidence. Beard's DNA was not on the rifle. From the forensic evidence, it appears that the person shooting the victim was proficient with a rifle, and appellant's mother testified that appellant was proficient with a rifle. Beard admitted being on drugs the day of the shooting. Beard could not even see appellant to identify him in the courtroom; however, Beard did testify that he had only known appellant for three days before the murder and stated that he did not have his glasses. Beard testified that the only reason he even talked to appellant was to obtain drugs.

13

Based on the evidence, Beard could not have been prosecuted for the same offense or a lesser included offense.  *See Paredes*, 129 S.W.3d at 536; *Blake*, 971 S.W.2d at 454–55. Appellant's third point of error is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


January 26, 2012

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.


**Publish.  Per motion granted 2-16-12.**