**Opinion filed March 14, 2024**



# In The

# Eleventh Court of Appeals

_____

## No. 11-22-00200-CR

_____

## RONALD GAYLON HARGROVE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 50th District Court**
**Baylor County, Texas**
**Trial Court Cause No. 5757**

## M E M O R A N D U M   O P I N I O N

Appellant, Ronald Gaylon Hargrove, appeals his conviction of intoxication manslaughter, a second-degree felony.  *See* TEX. PENAL CODE ANN. § 49.08 (West 2011).  A jury found Appellant guilty and sentenced him to a term of ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice, but the jury recommended that the sentence of confinement be suspended and that Appellant be placed on community supervision.  The trial court sentenced

Appellant in accordance with the jury's verdict and placed him on community supervision for a term of ten years. On appeal, Appellant contends that there is insufficient evidence to prove that he was intoxicated at the time of the accident. We modify and affirm.

*Background Facts*

Linda Kristine Florez drove her black Ford Explorer westbound on State Highway 114, returning home after her son's football game. Florez reached the intersection of SH 114 and FM 1790 at approximately 9:30 p.m. In the darkness, Florez missed her right turn onto northbound FM 1790, so she slowed down, drove onto the right shoulder of eastbound SH 114, and then made a U-turn. Florez's maneuvers were observed by a driver behind her, Eric Jerome Robledo, Sr., who confirmed that she had taillights on and her headlights on, she missed the turn, and she used her blinker as she U-turned. Driving slowly on the shoulder, Florez attempted the turn—now a left turn across both lanes of traffic—and Appellant's vehicle, driving eastbound, crashed into the left side of Florez's vehicle at an impact speed between seventy and seventy-five miles per hour. Florez died as a result of the crash.

An unidentified female called 9-1-1. Paramedics arrived on scene at 9:57 p.m., where they found Appellant "attempting to vomit." The EMS record described Appellant as "Event Oriented, Person Oriented, Place Oriented, Time Oriented," and indicated that there was no evidence of alcohol or drug impairment. Within ten minutes, paramedics loaded Appellant into an ambulance and drove to Seymour Hospital.

Glen Scott Vickers, a Seymour Hospital paramedic for thirty-four years, rode with Appellant to the hospital. Pursuant to hospital procedure, Vickers prepped a puncture site with an alcohol swab and drew three vials of Appellant's blood. Once

2

at the hospital, Vickers promptly handed these vials to a charge nurse and then they were taken to the hospital lab for testing. Doctors ran additional tests on Appellant, including testing for verbal and motor responses, on which Appellant scored perfectly. The doctors found only minor contusions and scrapes on Appellant, and they permitted him to leave about one and one-half hours after he arrived.

Department of Public Safety Trooper Joshua Lee Collins met Appellant in the hospital parking lot and interviewed him. Appellant recounted his version of the events: he was driving eastbound on SH 114 when he saw two vehicles travelling westbound near the FM 1790 intersection. The first vehicle turned right onto FM 1790, but the second vehicle "got way wide" and turned until it "was almost in the opposite shoulder."[1] The vehicle then turned "right out in front of" Appellant, and he hit the brakes, swerving into the westbound lane in an attempt to avoid her.

After Appellant finished telling his version of the event, Trooper Collins asked Appellant for a blood specimen. Appellant replied that blood had been taken at the hospital, he had been "poked enough," and that he wanted to go home; Appellant performed a horizontal gaze nystagmus test at Trooper Collins's request. Trooper Collins did not believe that Appellant was intoxicated and told Appellant he would subpoena the blood from the hospital because Appellant refused to provide a specimen.

The hospital's blood-serum test indicated that Appellant was intoxicated at the time of the accident.[2] The hospital tested Appellant's blood using the Dimension

---

[1]Although Appellant described the second vehicle as the one that failed the turn, Robledo testified that Florez was in front of him.

[2]A blood-serum test (or serum blood test) is a colloquial name for a type of enzymatic immunoassay, a test that uses enzymes to quantify the presence and amount of certain chemicals. The hospital administered an enzymatic immunoassay using alcohol dehydrogenase (ADH).

EXL, a common analyzer in Texas clinics and hospitals, and determined that Appellant's blood contained approximately 182mg/dL (milligrams per deciliter) of ethyl alcohol. Jim Blundell, a DPS forensic scientist, explained that blood-serum tests will return a higher alcohol percentage than standard forensic tests due to water content, but commonly accepted conversion factors account for this and reliably translate blood-serum-test results into a whole blood value. Blundell calculated that a blood-serum-test result of 182mg/dL meant that Appellant's blood alcohol concentration shortly after the accident was about .15.

In addition to the blood-serum test, both Appellant and the State provided accident reconstruction experts who testified: DPS Trooper Jonathon Tyler Thomas for the State, and Ronald James Feder for Appellant. Both experts used similar methods to recreate the accident analyzing tire marks at the scene of the crash, as well as "black box" data from Florez's vehicle.[3] The experts agreed that the point of impact was in the westbound lane of SH 114, and that Appellant was driving the speed limit. Trooper Thomas assumed Appellant's speed, whereas Feder calculated Appellant's speed based on crash data from Florez's vehicle. The experts also concurred that there were no tire marks prior to the crash but characterized the absence of tire marks differently. Trooper Thomas concluded that the absence of pre-crash tire marks meant that Appellant did not "slam[] on" his brakes, while Feder stated that "just because we don't have tire marks doesn't mean braking didn't occur." Trooper Thomas's testimony went further, noting that the accident occurred on a long, straight stretch of SH 114 without any observable obstructions, and he ended his testimony with the conclusion that a sober driver could have avoided the

---

[3]The "black box" records data prior to an accident. Appellant's vehicle did not contain a black box. The black-box data from Florez's vehicle showed that she had successfully completed a U-turn. In the five seconds prior to the crash, Florez had accelerated from eight to sixteen miles per hour.

accident.[4]  On cross-examination, Trooper Thomas testified that with the headlights on, the view of the accident area would not have been obstructed to an oncoming vehicle's driver.  Trooper Collins's body camera footage, which was admitted and published to the jury, contained Appellant's initial explanation of how the accident happened.  The State argued that Appellant's explanation to Trooper Collins was inconsistent with the reconstructed path of Florez's vehicle as agreed to by both testifying experts and as testified to by the eyewitness, Robledo.

*Standard of Review and Applicable Law*

In Appellant's sole issue, he contends that the State presented insufficient evidence on the intoxication element.  We confine our analysis accordingly.  *See Moore v. State*, 935 S.W.2d 124, 126 (Tex. Crim. App. 1996) (stating that in a sufficiency review, the court assesses evidence as to elements that are challenged).

When we review sufficiency of the evidence, we apply the sufficiency standard found in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).  In evaluating a sufficiency challenge, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt.  *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  When conducting a sufficiency review, we consider all of the evidence admitted at trial, including pieces of evidence that may have been improperly admitted.  *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton*, 235 S.W.3d at 778.  The appellate court's duty is not to sit as a thirteenth juror reweighing the evidence or deciding whether it believes that the

---

[4]Appellant objected after the answer, and the trial court sustained the objection.  Appellant did not ask to strike the testimony or request a limiting instruction.

evidence established the elements in question beyond a reasonable doubt. *Ridings* v. *State*, 357 S.W.3d 855, 860–61 (Tex. App.—Eastland 2012, pet. ref'd) (citing *Blankenship v. State*, 780 S.W.2d 198, 206–07 (Tex. Crim. App. 1988)). We will not disturb the factfinder's determinations of credibility and resolutions of conflicts in the testimony. *Clayton*, 235 S.W.3d at 778. Therefore, where the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and defer to the factfinder's determination. *Id.*

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

We measure the legal sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily

increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

As charged in the indictment, a person commits intoxication manslaughter if the person operates a motor vehicle in a public place while intoxicated, and by reason of that intoxication causes the death of another by accident or mistake. *See* PENAL § 49.08. For purposes of Chapter 49, a person is intoxicated if he meets either of two conditions: (A) the person does not have the normal use of mental or physical faculties by reason of the introduction of alcohol or any other similar substance into the body; or (B) if the person has a blood alcohol concentration of 0.08 or more. *Id.* § 49.01(2).

*Analysis*

Appellant's blood-serum test indicated that, less than an hour after the crash, his blood alcohol content was approximately .15. Appellant argues that blood-serum tests are "inherently unreliable," and that standing alone, this test was insufficient to support a finding of intoxication. Based on the record before us, the blood-serum test constituted probative evidence of Appellant's intoxication. Further, the State offered additional evidence of intoxication.

The phrase *inherently unreliable* implicates the use of blood-serum tests per se, but other courts have relied on blood-serum tests as evidence of intoxication— and Appellant concedes as much. *See, e.g.*, *Wooten v. State*, 267 S.W.3d 289, 298 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *Morris v. State*, 214 S.W.3d 159, 177 (Tex. App.—Beaumont 2007), *aff'd*, 301 S.W.3d 281 (Tex. Crim. App. 2009); *Kuciemba v. State*, No. 14-08-00050-CR, 2011 WL 5055992 at *6 (Tex. App.— Houston [14th Dist.] Oct. 25, 2011, pet. ref'd) (mem. op., not designated for

publication).  Nevertheless, Appellant argues that the blood-serum test was not evidence of intoxication *as performed on Appellant*.  We disagree.

The reliability of the blood-serum test was extensively questioned at trial.  To introduce the blood-serum test and its results, the State called the lab manager of Seymour Hospital, Catherine Hosea.  As lab manager for the past twenty-two years, she performed and supervised toxicology tests at Seymour Hospital.  Part of managing toxicology tests included training with the Dimension EXL, the instrument that assayed Appellant's blood.

Hosea testified extensively about the Dimension EXL—about the training she had received directly from the manufacturer, the procedures to test for ethyl alcohol, and the daily system checks, as well as the quarterly calibrations specifically for alcohol testing.  Hosea also testified that three times a year, her lab is required to accurately run unknown samples to maintain its CLIA accreditation.  Hosea confirmed that the Dimension EXL was functioning the day of Appellant's test.  She did not conduct the test herself, but she oversaw the work of the technician that did.[5] Hosea clarified that the Seymour lab was not a forensic lab, but she expressed confidence in the reliability of the technician's work and the Dimension EXL's results.

Appellant took Hosea on voir dire to question her on the reliability of the blood-serum test.  To do so, Appellant introduced two documents: a presentation paper from the American Academy of Forensic Science and an article from the Journal of Legal Nurse Consulting.  These documents discussed the possibility of false positives in blood-serum testing in comparable scenarios.  The presentation paper discussed how high levels of lactate (lactic acid) and lactate dehydrogenase

---

[5]The technician had moved out of state for personal reasons and did not testify.

(LDH) can produce a false positive or elevated readings of alcohol, and that high levels of these chemicals are sometimes observed in patients experiencing shock or tissue trauma. The paper indicated that, in systems with ethanol present, lactic acid and LDH can cause a signal increase of up to 350%, observing greater effects when the system contained low to medium levels of ethanol (30-60mg/dL). Hosea confirmed that the lab did not perform a lactic acid or LDH test. The journal article stated that ADH testing detects all alcohol, not just drinking alcohol, and that contamination from an alcohol disinfectant could lead to elevated results. Vickers, the paramedic on the scene, confirmed that he used an alcohol swab prior to taking a blood specimen.

At the conclusion of Hosea's voir dire, the trial court admitted the blood-serum test over Appellant's objections regarding reliability. Appellant continued to challenge the probative value of the blood-serum test with additional testimony and evidence.

Appellant called forensic toxicologist Dwain Carroll Fuller to testify about the limitations of a blood-serum test. Fuller stated that forensic tests did not use enzymatic testing due to the possibility of falsely elevated or false positive results. He stated that blood-serum testing is "not any good for criminal work," and that the hospital records did not prove beyond a reasonable doubt that Appellant was intoxicated.

Appellant also introduced six additional documents through Fuller to challenge the reliability of blood-serum testing. These documents included journal articles, a selection of published scientific letters sent from scientists to journals, and a case report of a false positive in 2009. Fuller summarized each of these lengthy documents. Generally, these documents retreaded the reliability questions Appellant explored during his voir dire examination of Hosea. They highlighted potential

reasons for false positives in a variety of blood testing procedures and cases in which scientists observed false positives in non-forensic testing.

Fuller also revisited the two previously introduced documents (the presentation paper and article), which touched on the relation of medical testing and legal evidence. Fuller read to the jury the journal article's conclusion that gas chromatography is "required" to confirm ADH testing. The presentation paper, on the other hand, stated that ADH testing could be used as evidence in legal settings, and the paper considered false positives to be "rare." No evidence was presented that false positives or elevated readings had been detected with use of the current equipment at Seymour Hospital.

Dr. Marc Krouse also testified about blood-serum testing generally. The State called Dr. Marc Krouse to testify about Florez's autopsy, but Appellant explored his opinions on blood-serum testing on cross-examination after he mentioned that gas chromatograph is ideal for forensic testing. According to Dr. Krouse, his lab uses gas chromatograph because it is "the gold standard for alcohol testing. Nothing is better." Dr. Krouse said that his lab did not use ADH testing "[b]ecause it has false positives." Dr. Krouse said that false alcohol readings usually returned a low value, but that it was a "crapshoot." He went on to say that in order to obtain an artificially elevated reading as high as Appellant's, it meant the hospital had "grossly contaminate[d] the specimen with . . . isopropyl." Dr. Krouse concluded that a false positive was "not likely," but he could not say "with a hundred percent certainty" that the reading was accurate.

As detailed above, there was conflicting evidence concerning blood-serum test results. Appellant's trial counsel thoroughly explored the risks and uncertainties of blood-serum testing, both generally and as applied to Appellant; the State offered evidence that the test was reliable despite these concerns. The jury presumably

resolved this conflicting evidence in favor of the State. Viewed in a light most favorable to the verdict, the blood-serum test as performed on Appellant constituted evidence of his intoxication. *See Clayton*, 235 S.W.3d at 778.

But we do not view that evidence in isolation. Appellant argues that even if the blood-serum test is probative, there is no other evidence of Appellant's intoxication. But other evidence, viewed in a light most favorable to the verdict, also support the jury's finding of intoxication.

The jury could have deduced that Appellant was intoxicated because he did not apply or "slam" on his brakes prior to the collision. Failure to brake before a collision provides some evidence that the accident was caused by intoxication. *See Kuciemba v. State*, 310 S.W.3d 460, 463 (Tex. Crim. App. 2010). Department of Public Safety Trooper Justin Bradley Kaiser, who was trained in crash reconstruction, pointed out the lack of tire marks prior to the crash and testified that Appellant would have left tire marks if he had "locked onto" his brakes. Feder stated that there was no evidence whether Appellant applied his brakes or not, but he calculated that Appellant was travelling at seventy to seventy-five miles per hour when the impact occurred. Based on the record, the jury could have inferred that Appellant did not have the normal use of mental or physical faculties by reason of the introduction of alcohol when Appellant failed to perceive and react by emergency braking before the accident. His failure to avoid, in light of Robledo's ability to see and navigate the intersection, may have been a factor in the jury's assessment of Appellant's intoxication. Further, if the jury believed that Appellant's original explanation to Trooper Collins regarding how the accident occurred was inaccurate, the jury could have properly inferred that he was without the normal use of physical or mental faculties due to intoxication.

Refusal to submit to a blood-alcohol test is relevant as evidence of intoxication. *Griffith v. State*, 55 S.W.3d 598, 601 (Tex. Crim. App. 2001); *Perez v. State*, 495 S.W.3d 374, 383 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("The jury may consider appellant's refusal to provide a breath or blood sample as probative evidence of his intoxication."); *see* TEX. TRANSP. CODE ANN. § 724.061 (West 2022) ("A person's refusal of a request by an officer to submit to the taking of a specimen of breath or blood, whether the refusal was express or the result of an intentional failure to give the specimen, may be introduced into evidence at the person's trial."). Trooper Collins asked Appellant to provide a voluntary blood specimen. Appellant told Trooper Collins "they got my blood in there," while gesturing to the hospital. When Trooper Collins clarified that the blood specimen would be for police, Appellant responded "it doesn't matter to me. I've been poked enough, I'll tell you, for the evening." He went on to say that he was having "the worst night of [his] entire life" and that he just wanted to go home. The jury was free to weigh Appellant's reasons against his refusal and decide that his responses were an effort to conceal his intoxication or that his refusal was evidence of his intoxication.

In conclusion, the cumulative force of all incriminating evidence regarding Appellant's intoxication is sufficient to support Appellant's conviction. *See Hooper*, 214 S.W.3d at 13. We cannot say that the evidence was such that no rational trier of fact could have found beyond a reasonable doubt that Appellant was intoxicated at the time of the accident. We will not disturb the factfinder's determinations of credibility and resolutions of conflicts in the testimony. *Clayton*, 235 S.W.3d at 778. The blood-serum-test results, the inference of Appellant's failure to execute emergency braking, his disputed rendition regarding how the accident occurred, and

his refusal to submit to a blood-alcohol test, together are sufficient to support the jury's verdict. We overrule Appellant's sole issue.

However, we note that the trial court's judgment incorrectly reflects the fine amount as $13,150. The jury assessed a fine of $10,000, and the trial court imposed that amount in accordance with the jury's verdict. Because the trial court assessed a $10,000 fine, the maximum fine allowed by statute for a second-degree felony, when it orally pronounced Appellant's sentence, and because we have the necessary information for reformation, we modify the trial court's judgment to reflect the correct fine amount of $10,000. *See* PENAL § 12.33(b) (West 2019); TEX. R. APP. P. 43.2(b); *Coffey v. State*, 979 S.W.2d 326, 328–29 (Tex. Crim. App. 1998).

*This Court's Ruling*

We modify the trial court's judgment to reflect that the fine imposed was $10,000. As modified, we affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


March 14, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

13